UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

EDWARD ROY JOHNSON, Executor of the )
Estate of JAMES GREGORY )
CARTER, Deceased, )
                                    )
            Plaintiff,              )
                                    )       CASE NO. 4:06-CV-22
v.                                  )       *Lee*
                                    )
LINCOLN COUNTY, TENNESSEE, *et al.*, )
                                    )
            Defendants.             )

## MEMORANDUM AND ORDER

### I.  Introduction

Before the Court is the motion of Defendants, Lincoln County, Tennessee ("Lincoln County"); the Lincoln County Sheriff's Department ("Sheriff's Department"); and Sheriff Jimmy Mullins ("Mullins") for summary judgment pursuant to Fed. R. Civ. P. 56 [Doc. 55] and a brief in support thereof [Doc. 56]. Plaintiff, Edward Roy Johnson, Executor of the Estate of James Gregory Carter ("Carter"), has filed a response in opposition to Defendant's motion for summary judgment [Doc. 59]. Defendants have filed a reply to Plaintiff's response [Doc. 61].

Consequently, Defendant's motion for summary judgment is now ripe for review. For the reasons which follow, Defendant's motion for a summary judgment [Doc. 55] will be **GRANTED** and Plaintiff's claims against Defendants under 42 U.S.C. § 1983 and under the Tennessee wrongful death statute, Tenn. Code Ann. § 20-5-113, will be **DISMISSED WITH PREJUDICE**.

## II.    Background

### A.    Procedural History

This action arises out of the unfortunate death of Carter, age 36, at the Lincoln County Jail ("Jail") on September 16, 2005 [Doc. 56 at 1; 60 at 1]. This action was commenced on April 20, 2006, by the filing of a verified complaint by the then-named Plaintiff, Gena Sharpe ("Sharpe") [Doc. 1, Complaint]. Sharpe, who was a former wife of Carter, brought this action on behalf of two of Carter's minor children, Laurelyn Carter and Riley Carter [*id.* at 3]. Sharpe alleged a cause of action for the violation of Carter's rights and his wrongful death beneficiaries' rights under the Fourth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 and also alleged a cause of action under the Tennessee wrongful death statute, Tenn. Code Ann. § 20-5-113 [*id.* at 1-4]. Specifically, the complaint challenged the constitutionality of certain policies and/or practices allegedly adopted and/or enforced by the Sheriff's Department and Mullins which allegedly failed to provide supervision and medical treatment necessary to protect Carter's life and health [*id.* at 1].

On May 25, 2006, Defendants moved for dismissal of the action for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) [Doc. 10]. On October 10, 2006, the Court granted Defendants' Rule 12(b)(6) motion in part and denied it in part [Doc. 19]. With regard to the § 1983 claims for the alleged constitutional deprivations suffered by Carter prior to his death, the Court found that as neither Sharpe nor his children were alleged to be the personal representative(s) of his estate, the claims would be dismissed [*id.* at 4-5]. The Court also dismissed the § 1983 claims for the loss of enjoyment of life, loss of companionship and mental anguish suffered by Laurelyn and Riley Carter as the result of the death of their father, finding such claims

were not cognizable in a § 1983 action [*id.* at 5]. On August 31, 2007, the current Plaintiff, the executor of Carter's estate, was substituted in lieu of Sharpe [Doc. 36]. On December 18, 2007, Plaintiff sought reconsideration of the dismissal of the § 1983 claims relating to the alleged violation of Carter's constitutional rights prior to his death, or in the alternative, leave to amend the complaint to add a federal claim on behalf of Carter [Doc. 49]. On February 22, 2008, the Court, under Rule 60(b)(6), reconsidered its dismissal of the § 1983 claims asserting Defendants violated Carter's constitutional rights prior to his death and reinstated only those claims [Doc. 54 at 11-12].

**B.    Facts**

This action arises out of Carter's death at the Jail on September 16, 2005. The complaint alleges Carter was arrested on September 15, 2005, and charged with violating a restraining order[1] obtained against him by his estranged wife, Donna Carter [Doc. 1, Complaint at 3, ¶ 11].[2] The complaint further alleges that "[w]hile in the custody of the Lincoln County Sheriff's Department on September 16, 2005, the Sheriff's Department told the family that [Carter] committed suicide by hanging himself with a blanket tied to an electrical fixture box located in his cell." [*Id.* at ¶ 12]. It is undisputed Carter was placed in cell 91 at the Jail, a single capacity cell across the room from the booking desk. A second floor "tower" manned by Correctional Officers ("COs" or "CO" when

---

[1]    Prior to Carter's arrest, in August 2005, Donna Carter obtained a mutual order of protection against Carter [Doc. 56-6, Donna Carter Deposition at 14, 23]. The restraining order was mutual and reciprocal; it provided Carter and Donna Carter could not go near or call each other [*id.* at 14-15]. A warrant for Carter's arrest was issued by the Lincoln County General Sessions Court on September 14, 2005 [Doc. 56-2]. In the warrant, Donna Carter alleged Carter had called her approximately seven times in five days [*id.* at 1]. Donna Carter testified she obtained the warrant because Carter threatened to kill her [Doc. 56-6, Donna Carter Deposition at 14].

[2]    The inmate property form from the Jail show that Carter's property was taken from him at the Jail at 4:41 a.m. on Friday, September 16, 2005 [Doc. 60-23]. Thus, it appears Carter was arrested in the early morning hours of September 16, not September 15.

singular) overlooked the booking area and the door to Carter's cell.

At approximately 3:00 a.m. on September 16, 2005, Magistrate Jim Davis ("Davis") spoke to Donna Carter's stepfather, Sam Shockley ("Shockley") [Doc. 56-7, Davis Deposition at 23-24]. Shockley told Davis there was an outstanding warrant for Carter's arrest for violating the order of protection [*id.* at 23]. Davis testified that Shockley told him that Carter was "liable to hurt" Donna Carter [*id.*]. Davis went to the Lincoln County Sheriff's Department at the Jail to see the warrant for Carter's arrest [*id.* at 27]. Davis testified that Shockley also went to the Jail [*id.*]. Davis testified he did not have the authority to tell the deputies who were present at the Jail to arrest Carter, but did notify the deputies about the warrant and told them "you-all may need to see into this right here." [*Id.*].

Lincoln County Deputy Kevin Troy Wells ("Wells") arrested Carter on September 16, 2005 [Doc. 56-21, Wells Deposition at 6]. Wells testified that at approximately 4:30 or 4:45 a.m. on the morning of September 16, 2005, Shockley came to the Sheriff's Department and informed them there was an outstanding warrant for his son-in-law, Carter [*id.*]. Wells was present at the Sheriff's Department and his sergeant called him over [*id.*]. Wells stated that Shockley was under the assumption that Carter was going to be leaving or moving out of town and he wanted the arrest warrant to be served [*id.*]. Wells' sergeant told him to go and arrest Carter [*id.*]. Wells testified Carter's arrest was accomplished peacefully [*id.* at 6]. Carter was initially upset at being awakened at 4:30 or 4:45 in the morning, but Wells stated that once Carter "explained his case," he calmed down [*id.* at 7]. Carter told Wells: (1) Donna Carter had violated the order of protection first by calling him and (2) he had a home cordless telephone on which Donna Carter's telephone number appeared on caller ID [*id.* at 7-8]. Wells explained to Carter he would have to arrest him, telling

4

Carter "I have paperwork in hand for you." [*Id.* at 7]. He told Carter despite his claim that Donna Carter had violated the order of protection first, "I still have to serve this paperwork. I have to, you know, follow due process." [*Id.*]. Wells told Carter to bring the cordless telephone with him to the Jail and to show it to the magistrate. [*Id.* at 7-8]. Wells testified he did not even have to handcuff Carter because Carter complied with him [*id.* at 10]. Wells stated Carter did not indicate to him in any way that he was contemplating suicide [*id.*]. He stated the only thing Carter was adamant about was that he could not miss work [*id.*].

Carter was booked at the Jail by COs Patrick Pullen ("Pullen") and Kris Carr ("Carr"). Pullen testified Carter's booking was uneventful [Doc. 56-14, Pullen Deposition at 16]. Pullen testified Carter "was just kind of like anybody else. He wasn't happy to be there, of course . . . But he wasn't, in my opinion, upset or mad, really, . . . he was talkative and joking around a little bit and thing like that." [*Id.*]. Pullen also testified that as he was being booked, Carter again tried to state his case that Donna Carter had called him on multiple occasions and had also broken the order of protection [*Id.*]. Pullen testified he told Carter he had nothing to do with whether Donna Carter had also violated the order of protection and he was "just there to book him in." [*Id.* at 54].[3]

Carr testified Carter was pretty quiet during his booking [Doc. 56-5, Carr Deposition at 19]. He stated Carter never raised his voice, but was just generally upset at being arrested [*id.*]. Carr testified Carter "kept saying over and over look at the [cordless] phone, look at the phone." [*Id.*]. Carr also testified he was supposed to do cell checks once every hour [*id.* at 18]. Carr did one cell check after Carter was placed in cell 91 [*id.*]. Carr testified that while he was doing the cell check,

---

[3] An inmate property report concerning the property taken from Carter at the Jail on September 16, 2005, does not show a cordless telephone [Doc. 60-23]. It does, however, list a cellular telephone [*id.*].

Carter again mentioned the cordless phone to him [*id.* at 7, 18]. Carr testified he told Carter he was not a lawyer or judge and that Carter would have to take the cordless phone to court [*id.*]. Carr also told Carter the job of the COs at the Jail was not to judge innocence or guilt [*id.*].

Carr testified there was a second or back-up log book which was kept in the booking room of the jail [Doc. 60-9, Carr Deposition at 29]. Carr examined pages from the back-up log book and noted that there were no entries in the back-up log book from about 11:43 p.m. on September 15 to 4:25 p.m. on September 16 [*id.* at 29]. Carr testified he knew of no specific reason for the approximately 16 hour gap in the back-up log book "other than a lot of times the book in the booking room is – we call it a backup book. . . it should have been logged down. . . . generally, the same thing that should be logged down in the tower should be in this one, but this one gets . . . the one in the booking room gets neglected a lot." [*Id.* at 30]. Carr said entries should normally have been placed in the log for the 16-hour period and that "[w]hoever was on that day shift . . . wasn't doing their job correctly if they didn't put that in there." [*Id.* at 30-31]. Carr further testified, "[a]s far as logging everything down in the book . . . they didn't do it right. Which I was one of them too. I neglected the book a few times myself." [*Id.* at 31]. A copy of the relevant page from the back-up log book is attached to Plaintiff's response to Defendant's motion as Exhibit S [Doc. 60-20].

Davis testified that after Carter had been arrested, he received a call on his cellular telephone informing him of Carter's arrest [Doc. 56-7, Davis Deposition at 29-30]. Davis told the caller that no bond was going to be set for Carter [*Id.*].[4]

---

[4] A bond form signed by Davis appears in the record [Doc. 60-24]. The form indicates that Carter was taken into custody at 4:30 a.m. on September 16, 2005 [*id.*]. The form also states "Hold For Court." [*Id.*]. Finally, the form indicates Carter's case was continued for trial until 9:00 a.m. on September [date unintelligible], 2005 [*id.*].

CO Gerald Robinson ("Robinson") testified Carter was the only inmate in cell 91 [Doc. 56-15, Robinson Deposition at 58, 59]. CO Timothy Jones ("Jones") testified that no inmates had access to Carter, except for trustees, and that at that time COs Ruby Jean Dunivan ("Dunivan") and Billy Wurtzinger ("Wurtzinger") would have been present [Doc. 56-10, Jones Deposition at 37-38].

The Jail Population Checklist for September 16, 2005, is attached to the deposition of Wurtzinger [Doc. 56-22 at 6]. The population checklist shows CO Gail Sanders ("Sanders") checked all cells at 7:30 a.m., Wurtzinger checked all cells at 8:05 a.m., Wurtzinger checked the cells in the booking area at 9:35 a.m., Robinson checked all cells at 10:25 a.m., and Dunivan and Wurtzinger checked all cells, including booking, at 11:10 a.m. [*id.*].

Jones testified that if an inmate is on suicide watch, his cell is checked more often, every 15 minutes [Doc. 56-10 at 30]. Jones stated Carter was never on suicide watch [*id.*]. He stated when Carter was booked into the Jail, there were a series of questions that were asked relating to suicide, such as whether the inmate felt he wanted to hurt himself [*id.*]. Jones stated, "[n]othing that I saw or nothing that anyone told me about [Carter] seemed suicidal." [*Id.*]. Jones also testified that if he had seen anything out of the ordinary relating to Carter he would have reported it to the TBI during their investigation [*id.* at 38].

Sanders spoke with Carter at approximately 8:15 a.m. on September 16, 2005 [Doc. 56-16, Sanders Deposition at 11]. Sanders stated that Carter wanted to know when Davis would arrive [*id.*]. Sanders told Carter that Davis would probably be in later in the morning [*id.*]. Carter also wanted to know if bond had been set [*id.*]. Sanders told Carter he did not have a bond at that time, but that Davis might give him one after he had an opportunity to talk with Carter [*id.*]. Sanders also stated there was no indication Carter had any suicidal tendencies when Sanders talked with him [*id.*].

Sanders testified he did not speak with Carter face-to-face any other time that day, but that while he was working in the "tower," he observed Carter looking into the booking area [Doc. 60-8, Sanders Deposition at 12].

Jones testified he did a head count at approximately 6:00 a.m. on the morning of September 16, 2005 [Doc. 56-10, Jones Deposition at 9]. Jones stated Carter was asleep on his bunk facing the wall [*id.* at 9-10]. Jones stated he beat on the cell door and Carter looked up [*id.* at 10]. Jones states during a head count he asks an inmate what his name is and if the inmate does not answer, he opens the cell door and goes in, but if the inmate responds, he proceeds to the next cell [*id.*]. Jones asked Carter what his name was and Carter responded, "James Carter". [*Id.*].

Jones testified he worked the second floor tower at the Jail most of that morning [*id.*]. He testified sometime between 9:00 a.m. and 9:30 a.m., he was looking out the tower windows, which overlook the booking area of the Jail, and saw Carter "standing at the window at the cell just looking around." [*Id.*]. Wurtzinger also testified he saw Carter between roll call and lunch on September 16, 2005, standing by the door to his cell [Doc. 60-14, Wurtzinger Deposition at 20]. Wurtzinger stated many inmates often stand by the door to their cell [*id.*].

Robinson said shortly after 10:25 a.m. on September 16, 2005, he let the inmate in cell 90 out to use the phone, the inmate used the phone and returned to his cell [Doc. 56-15, Robinson Deposition at 47]. Robinson stated when he let the inmate in cell 90 out, he saw Carter standing at the window of cell 91 looking out [*id.*].

Robinson also testified about the plastic sheets which covered the bottom pane of glass in the cells [Doc. 60-22, Robinson Deposition at 21]. Robinson stated the plastic sheets were "more clear than tan." [*Id.* at 21]. He also testified the bottom panes of glass had been blocked by the

plastic sheets to protect the privacy of the inmates housed in the cells [*id.* at 21-22]. Robinson testified that if one of the sheets had been removed from the bottom pane of glass he would have reported it to his sergeant [*id.* at 22]. Robinson stated he did not know if the plastic sheet would have been replaced if it had been removed because he never had to report the bottom glass pane had been uncovered because, as far as he could remember, the bottom pane had always been covered [*id.*].

CO Rhonda Wilkerson ("Wilkerson") testified she was working in the tower when Carter was discovered dead [Doc. 60-15, Wilkerson Deposition at 10]. Wilkerson testified that she could see part of cell 91 from the tower [*id.* at 11]. Wilkerson stated parts of all of the cells can be seen from the tower, but the toilets were placed in the cell so that the toilets could not be seen [*id.* at 11]. Wilkerson said a CO could look through the front door of a cell to see if an inmate was standing by the door and also could see a little further back into the cell [*id.* at 12]. Wilkerson also said she saw Carter at about 6:00 a.m. in the morning, standing at the door of his cell and looking out [*id.*].

Pullen also stated there is always someone on duty in the tower without exception [Doc. 60-16, Pullen Deposition at 42]. Pullen stated someone is not always on duty in booking because he or she may be needed elsewhere or may be responding to problems in the Jail [*id.* at 43]. Pullen stated you can see part of cell 91 from the "tower," but not all of it [*id.*]. Pullen also stated that from the booking area you would be able to see "[a] little bit more [of cell 91] than possibly the tower." [*Id.* at 44]. Pullen further stated that if a CO was walking past cell 91, the CO would be able to see what the inmate in the cell was doing if the CO looked [*id.*].

At approximately 11:00 a.m., Dunivan, Wurtzinger, and two trustees, Franklin and Braden, began serving lunch at the Jail [Doc. 56-22, Wurtzinger Deposition at 10-11, Doc. 56-8, Dunivan

Deposition at 7]. Wurtzinger testified that at approximately 11:10 a.m., after handing lunch to the inmate in Cell 90, one of the inmates opened the door to hand Carter his lunch and said something was wrong [Doc. 56-22, Wurtzinger Deposition at 11]. Dunivan said she heard one of the trustees ask Carter, "Man, do you want something to eat?" [Doc. 56-8, Dunivan Deposition at 7]. Dunivan said there was no answer and the other trustee said, "Well, that man's hung himself." [*Id.*]. Wurtzinger said after opening the door, the trustees never entered cell 91, they moved back and he was the first person to enter cell 91 [Doc. 56-22, Wurtzinger Deposition at 11]. Wurtzinger stated that he did not know if Dunivan entered the cell – she went to call for Jones and Robinson to come down from the tower and help [*id.* at 11-12].

Wurtzinger stated Carter was hanging, using a knotted white sheet as a rope, in a seated L-position with his back against the cell wall and his legs stretched straight out in front of him [Doc. 56-22, Wurtzinger Deposition at 12-14]. Carter was hanging a "little off the floor." [*Id.* at 12]. Wurtzinger testified he could not remember how many knots were in the sheet, but he was the first to try and untie it, it was very tight, and he could not get it down [*id.* at 12, 14]. The sheet had been pushed into an old electrical outlet in the wall and had been tucked in or twisted into the outlet [*id.* at 12; Doc. 56-15, Robinson Deposition at 38; Doc. 56-20, Thornton Deposition at 83].

Jail Administrator Chris Thornton ("Thornton") testified the sheet was in what "used to be an electrical outlet for turning on and off the lights." [Doc. 56-20, Thornton Deposition at 83]. Thornton stated the "switch stopped working and we put . . . something like concrete into it and the inmates pick it out. Then you put it back in there and the inmates pick it back out." [*Id.*]. Thornton stated the light switches had been repaired, and he inspected the repairs when they were done [*id.* at 84]. Thornton stated all the light switches in the cells were removed [*id.* at 84]. Thornton also

testified that if someone at the Jail had knowledge of a hole in the wall, it should have been reported to him so it could have been fixed [Doc. 60-5, Thornton Deposition at 89].

With regard to the hole in the wall in cell 91, Thornton testified the Jail had made efforts to repair the hole during the time he was employed as administrator [Doc. 65-6, Thornton Deposition at 101-02]. Thornton stated the hole had been filled with concrete and the inmates had dug it out [*id.* at 102]. Thornton also stated the Jail had put a metal plate over the hole and the inmates had pulled it out [*id.*]. Thornton stated the hole had been concreted or plastered over twice and covered by the metal plate once [*id.*]. Regarding the metal plate, Thornton also stated there was a security risk created by an inmate having a flat piece of metal inside the Jail because the inmates would pull and/or use anything metal [*id.*].

Thornton also testified about the plastic which covered the bottom pane of glass in the door to cell 91. A picture of the door to cell 91 is attached as Exhibit F to Plaintiff's response to Defendants' motion [Doc. 60-7]. Thornton testified that if the bottom pane of glass had not been covered, someone seated in the booking area would have been able to see through the bottom pane of glass [Doc. 60-5, Thornton Deposition at 89-90]. Thornton denied, however, that someone seated in the booking area and looking through the bottom pane of glass would have been able to see Carter's feet and legs through the bottom pane [*id.* at 89]. Thornton stated that a CO seated in the booking area and looking into the bottom pane of glass, would be able to see into the bottom right portion of the bottom pane, but not able to see into the bottom left portion of the bottom pane [*id.* at 90]. Thornton stated the reason the bottom pane on the door to cell 91 had been covered up was that there was an "[i]nmate in there previously showing his privates or a female trying to show privates." [Doc. 65-2, Thornton Deposition at 78]. Thornton testified there is a toilet in cell 91 and

that both male and female inmates were housed in cell 91 [Doc. 65-3, Thornton Deposition at 100]. Thornton testified that privacy consideration were one of the reasons the bottom pane of glass in the door to Cell 91 had been covered up because the privacy of the inmate is compromised if the bottom pane is not covered [*id.*]. Thornton testified the Jail constantly had to balance security considerations and privacy considerations [*id.*]. Thornton testified that because the bottom pane of glass was covered, COs were supposed to go to the window of the cell 91, through which they could see the entire cell, to check on an inmate during a head count [Doc. 65-5, Thornton Deposition at 101].

There is confusion among the COs as to which CO took what action in the attempt to save Carter. As noted, Wurtzinger testified that when he and Dunivan discovered Carter at approximately 11:10 a.m., Dunivan went for help and he attempted to untie the knot in the sheet, but that "it was so tight, I couldn't get it. By that time, that's when Thornton come down and relieved me." [Doc. 56-22, Wurtzinger Deposition at 12]. Thornton testified he went to cell 91 when Carter was discovered, the door was open and Carter was propped up with his back against the wall in a seated L-shape position with what appeared to be a white sheet around his neck [Doc. 56-20, Thornton Deposition at 50-51]. Thornton stated Wurtzinger was in the cell trying to untie the knot, but he pushed Wurtzinger away because he knew that at one point in time Wurtzinger and Carter had been related by marriage and he did not want Wurtzinger to have to deal with it because he was concerned about Wurtzinger's emotional state [*id.* at 52-53]. Robinson testified when he arrived at cell 91, Carter was hanging in a seated position and he pulled Carter's weight up off the rope/sheet and tried to start untying the sheet from around Carter's neck [Doc. 56-15, Robinson Deposition at 32-33]. Robinson testified he had been trying to untie the sheet/rope from around Carter's neck for a matter

of five or ten seconds when Thornton arrived and began helping him untie the sheet [*id.* at 33]. Robinson stated when Thornton began to untie the knot, he went to the medical room along with Deputy Tull Malone to get an automated external defribrillator ("AED") [*id.* at 33].

Thornton testified that when he first arrived at cell 91, Carter had no pulse and did not appear to be alive [Doc. 56-20, Thornton Deposition at 50]. Thornton testified he got the sheet off and checked for a pulse, but there was none [*id.* at 53-54]. Thornton testified he then ran for a phone and called Brenda Burns ("Burns") – the Jail nurse – and told her to "get down here now." [*Id.* at 54]. Thornton testified Burns arrived and began assessing Carter and that someone said to get the AED. [*id.*]. Thornton stated he and Burns placed Carter in a "laying position" and she began to check for a pulse. [*id.* at 54]. Thornton testified the AED arrived and Burns put the pads on Carter and turned the machine on and the machine said "no shock." [*Id.*]. Thornton stated that while all this had been going on, an ambulance had been called and the ambulance/EMT's arrived [*id.*]. Thornton stated he could not recall if the AED registered "no shock" prior to the arrival of the ambulance/EMTs [*id.*].

Jones testified he arrived at cell 91 with Robinson [Doc. 56-10, Jones Deposition at 15]. He stated he was trying to hold up Carter while Robinson was trying to unloosen or untie the sheet [*id.*]. Jones stated the knot was at the back of Carter's neck and he could not remember the number of knots, but "it was about two or three knots." [*id.* at 15]. Jones stated when he arrived at the booking area, Wurtzinger was outside the cell and he did not see Wurtzinger enter the cell and untie the knot [*id.* at 16]. Jones stated it was Thornton who eventually untied the sheet [*id.* at 20]. Jones also stated he saw the knot that had been slid down into the wall through the empty electrical outlet and that it was able to stay in the wall because it was a big knot – baseball to softball sized [*id.* at 20].

Burns was in her office when she received a call from Thornton telling her she was needed in booking [Doc. 56-4, Burns Deposition at 20]. Burns stated she looked at the clock on the wall in her office when Thornton called her and it read 11:08 [*id.*]. Thornton did not tell Burns the nature of the emergency, so she grabbed a pair or gloves, ammonia capsules and a blood pressure cuff as she always does [*id.* at 21]. Burns stated when she arrived at cell 91, Carter was sitting up against the wall in an L-position [*id.* at 22]. Burns said she and Thornton "took" Carter to the floor and she put an AED on Carter [*id.* at 31]. Burns stated the AED can be used to either establish a heart rhythm or to bring back someone who did not have a heart rate [*id.*]. Burns stated the AED indicated "no shock" which means that there was no rhythm for the machine to shock [*id.*]. Burns stated she only used the machine once on Carter because "[y]ou can only do what the machine tells you to do. You're not supposed to exceed what it tells you." [*Id.* at 31-32]. Burns stated she personally applied the AED to Carter and she heard the words "no shock" from the voice that comes out of the AED. [*id.* at 32]. Burns stated she was not surprised when the AED said "no shock" because she thought Carter was already dead [*id.*]. Burns stated by the time the AED said "no shock," the ambulance had already arrived and Dr. Norman arrived shortly thereafter [*id.*]. Burns testified she could not tell how Carter had died [Doc. 65-8, Burns Deposition at 58]. She also testified she had no idea how long Carter had been dead [*id.*].

In addition, Burns was asked about repairs that had been made to the Jail by the new Lincoln County Sheriff, Murray Blackwelder ("Blackwelder")[*id.* at 57]. Burns testified Blackwelder had made substantial repairs to the Jail since he became sheriff [*id.*]. She testified that the Jail was much safer than it was in September 2005 [*id.* at 58].

The log for the tower at the Jail, which is attached to Pullen's deposition, shows that an

ambulance was called at 11:13 a.m. on September 16, 2005, and the ambulance arrived at the Jail at 11:17 a.m. [Doc. 56-14 at 5]. The log shows that at 11:27 a.m. the phones were turned off, the doors were shut, and the area was secured [*id.*]. Although partially obliterated, the log shows Dr. Norman, the Lincoln County Medical Examiner, arrived at the Jail sometime between 11:27 a.m. and 11:53 a.m. and an agent from the Tennessee Bureau of Investigation ("TBI") arrived at 11:57 a.m. [*id.*].

Mullins testified an investigation into the circumstances surrounding Carter's death was performed by the TBI [Doc. 56-13, Mullins Deposition at 12]. Mullins stated he could not recollect the exact time he notified the TBI of Carter's death, "but it was more than likely within a few minutes from the time I heard it." [*Id.*]. Mullins stated he did not know if the only investigation of Carter's death was performed by the TBI, but his procedure was to notify the TBI and have them perform an investigation after he had gotten authority from the District Attorney for the TBI to take over a case [*id.*]. Mullins testified he learned of Carter's death from an employee of the Jail, but he did not recollect from whom [*id.*]. Mullins stated it was more than likely he was at the Jail when he learned of Carter's death, but he could not definitely remember [*id.*]. Mullins stated his procedure if there was a death at the Jail was to call the District Attorney and then to notify the TBI [*id.*]. Mullins stated he normally would notify the TBI before he notified any next-of-kin of the deceased [*id.*].

Mullins testified that because the TBI found no indication of foul play on anyone's part, he did nothing more to determine whether there was anything more that could have been done to prevent an incident such as Carter's death [Doc. 60-3, Mullins Deposition at 30-31]. Mullins could not recall if any investigation was done regarding whether Jail policies and procedures were

followed with regard to Carter [*id.* at 31]. He stated Thornton may have performed such an investigation, but he could not remember [*id.* at 31-32].

With regard to the number of employees at the Jail, Mullins testified "the State is the one that set up the required amount of jailers for it, which . . . if you only had four or five people to take care of 115 people and . . . its scattered." [Doc. 65-7, Mullins Deposition at 20]. Mullins opined there were not enough jailers and, if he had more jailers, he would have been better able to attend to the needs of the inmates "in most cases." [*Id.*]. When Mullins was asked if the Lincoln County Commissioners appropriate enough money for the Jail to be kept in good working order in terms of the repair of walls, floor, and ceilings, he testified:

> Well, there's a lot of repairs that we made that was tore up as soon as we put them in or shortly thereafter. The new sheriff asked for 40 something thousand dollars to fix the windows, and not too long ago they took a window out and three or four inmates crawled out of it.
> Regardless of what you repair or what you fix or put in a jail, you've got inmates that's got 24 hours a day, seven days a week to find out a way to tear it up. And that's what they do. That's just a jail. Anybody that's ever been around a jail would know that to be a fact.

[Doc. 65-7, Mullins Deposition at 20].

With regard to funding for the Jail, Mullins testified:

> Q.     Did you have a problem getting funding for the necessary - -
>
> A.     There always wasn't enough money.
>
> Q.     There was never enough money?
>
> A.     Right.
>
> Q.     The commissioners did not appropriate enough money?

|     |                                                                  |
|-----|------------------------------------------------------------------|
| A.  | Well, in my opinion they didn't.                                 |
| Q.  | What did you need money for that they didn't appropriate?        |
| A.  | Well, for the jail, it needed more camera equipment, more security equipment, more jailers. But the State is the one that set up the required amount of jailers for it, which you only – if you only had for or five people to take care of 115 people . . . . |

[Doc. 67-3, Mullins Deposition at 19-20]. Mullins also testified that, to the best of his knowledge, the Jail was taken care of and the inmates were properly cared for [*id.* at 24-25].

Mullins was also asked to describe the doors on the cells in the booking area [Doc. 60-3, Mullins Deposition at 32]. Mullins stated the doors were metal doors with glass sections in them [*id.*]. Mullins was also asked why the pane in the bottom of the cell doors was covered up [Doc. 67-3, Mullins Deposition at 32-33]. He testified, "I'm sure you've gone and seen the cells. There are commodes in there or bathroom facilities. If you've got a female in there and you got men out there working or whatever, you don't want to be able to visually see in there while they're using the bathroom or something." [*Id.* at 33].

Agent Gene Stegall ("Stegall") testified about the TBI investigation into Carter's death. Stegall testified he spoke with nine or ten officers as part of the investigation into Carter's death [Doc. 56-19, Stegall Deposition at 102]. He also spoke with either five or six individuals who were inmates in the Jail at the time of Carter's death [*id.*]. Stegall stated he talked with the inmates because, "They're there. They're present. Just because they're an inmate does not mean that they can't see things and hear and report things. . . sometimes we get statements out of inmates as well." [*Id.*]. Stegall estimated he interviewed approximately 21 people as part of his investigation into Carter's death [*id.* at 106]. Stegall also stated the case file involving Carter's death was not closed

prematurely [*id.*]. Stegall stated he did not have the authority to close a case file himself [*id.*]. He stated closing a case file had to be approved by a supervisor and "a supervisor is not going to approve that a case be closed unless the District Attorney has rendered an opinion that it is okay to close that case." [*Id.*]. Stegall stated he "met with the District Attorney General and presented the facts to him and made sure he had a complete copy of this file. And it was the opinion of the District Attorney's office that no further investigation was needed." [*Id.* at 106-07]. Stegall stated that based upon his investigation, "there [wa]s no evidence to suggest that there was any criminal activity involved in [Carter's] death." *Id.* Stegall also stated it was his opinion that Carter's death was a suicide, because his investigation recovered no evidence which indicated any person had violated the law [*id.* at 107].

Wayne D. Kurz, M.D. ("Dr. Kurz") performed an autopsy of Carter's body on September 17, 2005 at 8:50 a.m. [Doc. 56-11, Kurz Deposition at 8]. Dr. Kurz is board certified in anatomic pathology and forensic pathology by the American Board of Pathology [*id.* at 6]. At the time of the autopsy, Dr. Kurz was living in Nashville doing a one-year fellowship in forensic pathology [*id.* at 7]. Dr. Kurz stated that when he performed the autopsy he was directly supervised by Feng Li, M.D., Ph. D. ("Dr. Li") and Dr. Bruce P. Levy, the Chief Medical Examiner, also reviewed his report [*id.* at 8]. Dr. Kurz also testified that prior to giving his deposition testimony on January 21, 2008, he reviewed various documents including the depositions of Dr. Li; Pullen; Jones; Thornton; Stegall; Mullins; Wells; Wurtzinger; Rhonda Wilkinson; Burns; Sanders; Dunivan; Robinson; Donna Carter; Johnson; Sharpe; a report, curriculum vitae and deposition from Dr. Adel Shaker; and the autopsy report and photographs from the Jail and Carter's funeral [*id.* at 9]. Kurz testified the autopsy was requested by the Lincoln County Medical Examiner, Dr. Norman [*id.* at 12]. Dr.

Norman investigated the death from a medical-legal standpoint at the Jail [*id.*]. Dr. Kurz stated he was given a report from Dr. Norman and photographs of the scene of Carter's death [*id.*]. Dr. Kurz stated, his opinion, within a reasonable degree of medical certainty, was that the cause of Carter's death was hanging and the manner of death was suicide [*id.* at 13]. He stated his opinion of the circumstances of Carter's death was "hanged self." [*Id.*]. Dr. Kurz stated that during the autopsy, he found evidence of injuries consistent with a hanging on Carter's neck [*id.* at 14]. Dr. Kurz's specific findings were "some areas of a pale ligature mark on his neck, a few small abrasions of his neck, and a focal area of hemorrhage overlying the right side of his thyroid cartilage within his neck [*Id.*]. Dr. Kurz stated he found "no other injuries." [*Id.*]. Dr. Kurz also stated his external examination of Carter's body showed that no therapeutic procedures, *i.e.*, no medical intervention, took place prior to his death [*id.* at 16]. Dr. Kurz stated that since an AED was used on Carter, the pads were likely removed prior to the transportation of the body for an autopsy [*id.* at 16-17]. Dr. Kurz stated that other than the injuries to Carter's neck, the external examination of his body was unremarkable [*id.*]. Dr. Kurz stated there was no evidence of any trauma on Carter's hands or legs, no evidence of broken bones and no bruises except for the areas of hemorrhage on his neck [*id.* at 31-32]. There were no cuts, except one on Carter's neck, and no evidence of any blunt force trauma except for the ligature marks on his neck [*id.* at 32]. Dr. Kurz stated there were no signs that indicated Carter was involved in a struggle, there were no signs that Carter was defending himself from attack, and no signs he was injured in an accident [*id.* at 32-33].

Dr. Li gave a deposition on June 14, 2007, concerning the autopsy of Carter [Doc. 56-12]. Dr. Li stated all the signs of trauma on Carter's body were related to the hanging [*id.*, Li Deposition at 17]. Based upon the external examination of the body, Dr. Li stated that, except for the injuries

related to the hanging, there were no injuries which were consistent with any other trauma to Carter [*id.* at 17, 22]. Dr. Li stated there was no evidence Carter struggled in any way and no evidence of any defensive wounds, such as blunt force injuries or sharp force injuries [*id.* at 22]. Dr. Li stated he agreed with Dr. Kurz's findings [*id.* at 25]. Dr. Li opined, within a reasonable degree of medical certainty, the cause of Carter's death was hanging and the manner of death was suicide [*id.* at 26].

Adel Shaker, M.D., LLB, is a state medical examiner in Montgomery, Alabama [Doc. 56-17, Shaker Deposition at 3]. Dr. Shaker reviewed the autopsy report; photographs of the decedent in the morgue, Jail and funeral home; and the depositions of Dr. Li, Pullen, Jones, Thornton, Stegall, Rhonda Wilkinson, Troy, Wurtzinger, Sanders, Burns, Robinson, Mullins, "Arube Begime," and "Doonie." [*Id.* at 4]. Dr. Shaker stated he disagreed with the opinions of Drs. Kurz and Li [*id.* at 75]. When asked what the cause of Carter's death was, Dr. Shaker stated "I was not there. I'm not a witness how he died, but there is something happened to him." [*Id.* at 75-76]. Dr. Shaker stated his could not say that Carter died as a result of homicide, but stated the cause of Carter's death was non-natural and not suicidal cause [*Id.* at 76]. Dr. Shaker stated his opinion, "within a reasonable degree of medical certainty, is that Carter did not die of suicide." [*Id.*]. But Dr. Shaker was not able to say, within a reasonable degree of medical certainty, that Carter died as the result of a homicide [*Id.* at 76-77]. Dr. Shaker opined there was a non-natural cause of death, stating it "[c]ould be trauma, accidental, unintentional, he fell down due to anything like somebody give him a punch or choke hold or something like that. Then he comatosed and they decided, '[o]kay, He's dead. Let us simulate.'" [*Id.* at 77]. Dr. Shaker stated he could not say, within a reasonable degree of medical certainty, that Carter was strangled [*id.* at 77]. Dr. Shaker also stated it was preferable to have a body to examine rather than photographs in offering an opinion as to the manner and cause of death

[*id.* at 92-93].

Dr. Shaker also stated he was concerned about the inconsistencies of the COs at the scene about the number of knots tied in the sheet/ligature around Carter's neck [Doc. 60-18, Shaker Deposition at 93-95]. Dr. Shaker stated the horizontal ligature marks on Carter's neck could be consistent with either hanging or strangulation [*id.* at 95]. He also stated the inconsistency he was referring to concerned the testimony of the various COs about the number of knots that were tied in the sheet/ligature, not to any of Dr. Kurz's autopsy findings [*id.* at 97]. Dr. Shaker also stated the nature of the mark that is found on the neck of a person that is hanging will depend on whether the person has been hanging for several hours or has been found very quickly [*id.* at 96-97]. Dr. Shaker also admitted it would have helped with the quality of the opinion he could offer if he could have examined the sheet/ligature in this case rather than just looking at photographs of it [Doc. 56-17, Shaker Deposition at 106].

Plaintiff testified Carter was too selfish to commit suicide [Doc. 56-9, Johnson Deposition at 22]. Plaintiff admitted, however, he could not say with certainty Carter did not commit suicide [*id.*].

Donna Carter testified Carter "was Dr. Jekyll and Mr. Hyde." [Doc. 56-6, Donna Carter Deposition at 24]. She stated "[i]t was a flip of the coin. You didn't know who you were going to get. He could go off." [*Id.*]. Donna Carter also stated that in the three months preceding his death, Carter had given her some indication he could be suicidal at times [*id.* at 22]. She stated on one occasion they were traveling in an automobile at 55 or 60 miles per hour and Carter opened the car door, stating that he would "end it right here." [*Id.*]. She stated on another occasion Carter told her he was trying to kill himself and took all of the ibuprofen tablets she had in a bottle in her purse.

[*id.* at 22-23]. She stated just prior to the time she obtained the restraining order, Carter grabbed a knife and stated he "was going to do it." [*Id.* at 23]. She stated Carter wanted her to kill him [*id.*]. Donna Carter also stated on another occasion, which occurred outside of the three-month period prior to his death, she and Carter were remodeling and had just completed a hardwood floor and Carter stated "he was going to barricade all the doors and slit his throat all over the hardwood floor." [*Id.* at 24]. Sharpe also testified that one night, shortly after she and the children had moved out, Carter called her and said if she did not come over, he was going to take a bottle of pills [Doc. 56-18 Sharpe Deposition at 14]. Sharpe stated she called one of Carter's cousins, who went over and checked him, and, because the cousin did not know whether Carter had taken the pills, Carter was hospitalized [*id.* at 14-15]. Sharpe stated she went to the hospital to see Carter and the nurses told her his stomach had been pumped, but they were unable to determine whether Carter had taken the pills [*id.* at 15]. Sharpe stated there were no other occasions where Carter expressed any suicidal thoughts to her [*id.*].

Pullen testified there were five COs, plus a kitchen lady, on duty during the day shift in addition to administration who were in an out – so that there were about seven or eight different officers/administrators present at the Jail during the day shift and usually five COs present during the night shift [Doc. 56-14, Pullen Deposition at 2]. Thornton testified Sanders was not present at the Jail when Carter died on September 16, 2005 [Doc. 65-9, Thornton Deposition at 49]. Robinson testified that even with Sanders absent from the Jail, the Jail was not understaffed when Carter died [Doc. 65-10, Robinson Deposition at 60].

Ed Austin ("Austin"), Carter's former father-in-law and a former Jail administrator under Mullins for about 16 or 17 months, testified as to the back-up log book/sheet maintained in the

booking area [Doc. 67-4, Austin Deposition at 4-6]. Austin testified there was a book or log sheet that stayed in the booking room and whenever someone would come through a door it would be recorded in the tower log and that anything that went on in the booking room was supposed to be recorded in the booking room [*id.* at 27-28]. Austin testified anything that happened to an inmate should have been recorded in the back-up booking log [*id.* at 37]. Austin testified that failing to record such information would have been "very, very negligent." [*id.* at 38]. Austin testified that recording matters in the back-up booking log "helped cover me as jail administrator and Sheriff Mullins as sheriff of the county." [*Id* at 39 ]. Austin was specifically asked:

> Q.  If its not in that book, it didn't happen? Is that how you consider the importance of this book?
>
> A.  If it's not in this book, I can't say why it's not in this book, I can't say whether it happened or not unless there's some other documentation to back it up because this is all I have to go on right here. That and the other reports that might have been made.
>      . . .
> Q.  And if correctional officers left off the cell check notations or prisoner notations for that 16-hour period and there was a death within that 16-hour period, how would you characterize the work of that officer?
>
> A.  In my opinion, I don't think incompetence would explain it. It would be beyond incompetence. I mean, the potential of something going wrong and lawsuits coming from that is just so great in a jail facility. Anybody that work in a jail over five minutes knows that. And you have to cover – and I kept stressing to these people. Cover your tracks. Whatever you do, notate it. Whatever happens, notate it.
>
> Q.  And who would have been responsible for making sure that the notations were correctly entered in the logbook?
>
> A.  Whoever the supervisor was on that particular shift, which here your talking about two different shifts.

[*Id.* at 39-40].

23

Austin, stated he would be shocked and surprised if Carter had committed suicide [*id.* at 49].

Austin stated his opinion of what happened at the Jail was:

> I think [Carter] put that rope around his neck.  Went through the process of staging a suicide.  Never intended to kill himself, hoping somebody would find him and cut him down and get him out of that jail and get him to the hospital room.  That's what I think happened to [Carter].  I don't believe that he ever intended to kill himself.  I think it was accidental . . .

[*Id.* at 49].  Austin also admitted he did not know what happened at the Jail on September 16, 2005, and that it was also possible Carter and an officer had gotten into a fight [*id.* at 49-50].

Attached to Plaintiff's response to Defendants' motion is the "Facility Sercurity" [sic] policy for the Jail which sets forth procedures to be followed to ensure the safety of employees, visitors and inmates [Doc. 60-2 at 1].  The policy sets forth the following relevant procedures:

> 2.     ALL SECURITY DOORS WILL REMAINED (sic) LOCKED AT ALL TIMES. EVERY EFFORT MUST BE MADE TO IDENTIFY ANY AND ALL PERSONS WHO UTILIZE SECURITY DOORS WHETHER ENTERING OR EXITING FACILITY.
>
> 3.     REGULAR INSPECTION OF FACILITY WILL BE MADE ON A WEEEKLY (sic) BASIS BY THE CHIEF ADMINISTRATOR OR HIS/HER DESIGNATED REPRESENTATIVE.
> . . .
> 5.     ANY PERSON INJURED IN THIS FACILITY WILL BE GIVEN PROMPT MEDICAL ATTENTION.

[*Id.*].

## III.     Analysis

Defendants move for summary judgment on the state and federal law claims asserting: (1) the Sheriff's Department is not an entity separate from Lincoln County which can be sued under §

1983; (2) Mullins has been sued only in his official capacity, which makes the claim against him tantamount to a claim against Lincoln County for § 1983 purposes; (3) Lincoln County is not liable because the Plaintiff cannot demonstrate the existence of an unconstitutional policy, ordinance, regulation or decision, or that any policy, practice, or custom of Lincoln County was the "moving force" behind the injury alleged to Carter or that Carter's death was the result of homicide or accident [Doc. 56 at 13].

In his response, Plaintiff concedes Mullins "has not been sued and is not liable in his individual capacity." [Doc. 59 at 1]. Plaintiff contends, however, that genuine issues of material fact exist as to Plaintiff's § 1983 and state law claims. [*id.*]. Plaintiff also admits "there is no evidence in the record that Carter made any threats of suicide or otherwise demonstrated any signs of suicidal behavior on September 16, 2005." [Doc. 60 at 9]. Plaintiff further admits he "cannot prove who or what hurt Carter or whether it was accidental or otherwise." [*Id.*]. Plaintiff also states, "[t]he explanation of what happened to . . . Carter while he was in Cell No. 91 of the Lincoln County Jail and why may never be explained. That is not the purpose of this suit. This action is to hold Lincoln County and Sheriff Mullins to the federal constitutional and state standards as to adequate staffing, adequate supervision and training (including recording who entered and left the booking area where Carter was located) and adequate upkeep of the jail." [Doc. 60 at 22].

In his response, Plaintiff identifies four alleged policies, practices, or customs which he asserts led to Carter's death [Doc. 60 at 15-23]. First, Plaintiff asserts placement of clear or tan plastic material over the lower or bottom pane of glass in the door of cell 91 led to Carter's death. Plaintiff asserts "it was common practice for the bottom pane of cell 91 to be covered so that no one could fully see into the Cell and that any inmate of cell 91's security was compromised. It just so

happens that it was Carter's security that was compromised and obstruction into his Cell may well have been a moving force behind his death, whether it was suicide or otherwise." [*Id.*].

Second, Plaintiff asserts Lincoln County failed to train and supervise its employees to report needed repairs to the Jail and to make needed repairs, such as repairing the hole in the wall where the electrical outlet had been removed from cell 91 [*id.* at 16, 21]. Plaintiff asserts that "[t]he truth is that if the jail had not allowed to [sic] hole to go unpatched for 'God knows how long' and had trained its officers to report such a hazard and it was fixed, Carter would most likely be alive today." [*Id.* at 21].

Third, Plaintiff asserts Lincoln County failed to properly train and supervise employees as to the necessity of properly maintaining the back-up log book in the booking area [Doc. 60 at 17-19]. Plaintiff asserts that he has created a genuine issue of material fact as to whether the failure of Lincoln County to keep an accurate written back-up log book and account of who entered the booking area and cell 91 "so that there is no way to go back and tell who might have entered the booking area and Cell No. 91 and harmed Carter . . . ." [*Id.* at 19]. Plaintiff thus asserts the "lax" or "non-existent" keeping of the back-up log book for the booking area for the time Carter was in the Jail was a moving force behind Carter's death [*id.*]. Plaintiff asserts that "[i]f the staff of the Lincoln County Jail had properly looked who went in and out of the booking area where cell 91 was located, there might not be any questions whatsoever as to whether someone hurt or allowed Carter to be hurt in cell 91." [*id.* at 21].

Fourth, Plaintiff asserts the Jail was inadequately staffed [*id.* at 19-22]. Plaintiff asserts that "[i]f the facility had been properly staffed, who is to say that Carter might be alive today." [*id.* at 19]. Plaintiff asserts the alleged lack of a proper number of COs may have played "a part in Carter's

death because someone could have come into the booking area unnoticed or a correctional officer could have accidentally or purposefully hurt Carter and then staged it to look like a suicide." [*id.* at 20].

**A.  Standard of Review**

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, a court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The court cannot weigh the evidence or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute.  *Id.*  A mere scintilla of evidence is not enough.  *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

**B.  Section 1983 Claims**

**1.  Sheriff's Department**

"In § 1983 actions, a separate claim against a sheriff's office is rightly dismissed on the basis

that this 'office' is not a cognizable legal entity separate from the county government." *Henderson v. Lincoln County Sheriff's Dept.*, No. 4:03-CV-95, 2005 WL 2417064, * 4 (E.D.Tenn. 2005) (citing *Ravene v. Charles County Commissioners*, 882 F.2d 870, 874 (4th Cir. 1989)). Sheriff's departments are not entities subject to suit under § 1983. *Maroney v. Ward*, No. 3:08-CV-38, 2008 WL 509532, * 1 (E.D. Tenn. 2008).

### 2. Mullins

As noted, in his response to Defendants' motion for summary judgment, Plaintiff conceded Mullins "has not been sued and is not liable in his individual capacity." [Doc. 59 at 1]. Thus, Mullins has been sued only in his official capacity as the Sheriff of Lincoln County. The suit against Mullins in his official capacity is permissible under § 1983, but it is a suit against the entity on whose behalf he acts in his official capacity. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) (citing *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). A section 1983 action against a county official in his or her official capacity is treated as an action against the County entity itself." *Shamaezadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003) (citing *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992)).

### 3. Lincoln County

In this action, there are no individual defendants – the sole focus of this action is on the liability of Lincoln County. A local governmental entity, such as Lincoln County, cannot be held vicariously liable under § 1983 for the acts of its employees. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003). Liability under § 1983 attaches only where the constitutional violation is the result of the "execution of a government's policy or custom." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir.

2000). To establish a § 1983 claim against the local government entity, a plaintiff must: (1) identify the conduct properly attributable to the local governmental entity and (2) "demonstrate that, through its *deliberate* conduct the [local governmental entity] was the 'moving force' behind the injury alleged." *Bd. of County Comm'r of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997). *Monell* allows the imposition of liability upon a local government not only when the challenged conduct relates to a formally implemented and adopted written policy, but also when the challenged conduct constitutes a "custom" or "usage" which is not memorialized, but is so permanent and well settled that it has the force of law. *Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. of Educ.*, 103 F.3d 495, 507-08 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). Isolated and unprecedented incidents are insufficient to create liability for a municipality or county under § 1983. *Evans v. R. Eugene Johnson Detention Center*, No. 9:05-2426-HFF-GCK, 2007 WL 914265, * 6 (D.S.C. Mar. 22, 2007) (citing *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000)). Not only must the Plaintiff show Lincoln County caused a violation of Carter's constitutional rights, but in order to avoid *de facto respondeat superior* in contravention of *Monell*, the Plaintiff must show "a direct causal link between the custom and the constitutional deprivation." *Cash v. Hamilton County Dep'r of Adult Probation*, 388 F.3d 539, 543 (6th Cir. 2004), *cert. denied*, 546 U.S. 927 (2005)).

Where, as here, a § 1983 claim is asserted against a local government entity two issues must be addressed as part of a proper analysis of the claim: "(1) whether plaintiff's harm was cause by a constitutional violation, and (2) if so, whether the [county] is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119 (1992). Damages cannot be awarded against a local governmental entity based on the actions of any of its officers if the officers inflicted no constitutional harm. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

A local government may be held liable under § 1983 based on inadequate training, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The Sixth Circuit has held inadequate police training may amount to deliberate indifference where: (1) there are foreseeable consequences that could result from the lack of training or (2) there is a failure to act in response to repeated complaints of constitutional violations by officers employed by the local governmental entity. *Cherrington*, 344 F.3d at 646. Only where a failure to train reflects a "deliberate" or "conscious" choice by the county, can a county be held liable for a failure to train. *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999) (citing *Harris*, 489 U.S. at 389).

To the extent Plaintiff asserted a claim under the Eighth Amendment that Lincoln County acted with "deliberate indifference" toward Carter's serious medical needs while he was detained at the Jail, Plaintiff appears to have abandoned this claim. Plaintiff has conceded there is no evidence Plaintiff made any threats of suicide or engaged in and/or demonstrated any signs of suicidal behavior from the time of his arrest until the time he was discovered in cell 91 on September 16, 2005. Plaintiff adduced no evidence that any person at the Jail had any indication Carter was suicidal and, in fact, argued he was not suicidal. When Carter was discovered in his cell, Jail personnel acted promptly to untie his neck, to summon medical assistance, and to provide medical attention. Burns, the Jail nurse, quickly responded to cell 91, used an AED on Carter, and summoned an ambulance within a very few minutes of the discovery of Carter. Thus, there is no genuine issue of material fact, and as a matter of law, Lincoln County is entitled to a summary judgment on any claims of deliberate indifference under the Eighth Amendment as it relates to a serious medical needs claim.

With regard to Plaintiff's claims that certain alleged policies, procedures, and/or customs of Lincoln County – namely, obstructing the view through the bottom pane of glass in Carter's cell, failure to perform needed repairs, failure to train officers to maintain the booking area log, and failure to adequately staff the Jail – Plaintiff cannot establish a genuine issue of material fact as to whether a constitutional violation occurred. However, even giving Plaintiff the benefit of the doubt and assuming *arguendo* he could establish a constitutional violation in connection with Carter's death, Plaintiff cannot establish that any of the alleged deficiencies constituted policies, procedures, or customs of Lincoln County or that such alleged policies, procedures, or customs were the moving force behind the constitutional violation.

In addition, to the extent Plaintiff claims the policies, practices, or customs of Lincoln County constituted a policy of "inaction", he has not established a genuine issue of any material fact as to any clear and persistent failure on the part of Lincoln County to protect inmates or detainees at its Jail from harm, injury, or death. To state a municipal liability claim under an inaction theory a plaintiff must establish: (1) the existence of a clear and persistent pattern of failure to protect detainees or inmates from harm or death; (2) notice or constructive notice on the party of the County, (3) the County's tacit approval of the unconstitutional conduct such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) the County's custom was the "moving force" or direct causal link in the constitutional deprivation. *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005) (citing *Doe v. Claiborn County, Tenn. By and Through Claiborne County Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996). "[A]n alleged policy of inaction 'must reflect some degree of fault before it may be considered a policy upon which § 1983 liability may be based.'" *Garretson v. City of Madison Heights*, 407 F.3d 789, 796

(6th Cir. 2005)).

If the state places an individual in a custodial setting, it has a duty to protect such an individual from harm inflicted by third-parties. *Sperle v. Michigan Dep't of Corrections*, 297 F.3d 483, 491 (6th Cir. 2002). However, even where such duty exists, a state actor is liable for the breach of such duty "only if they engaged in conduct that was so egregious that it can be said to be arbitrary in the constitutional sense." *Id.* (internal citations omitted). Plaintiff cannot meet this standard. Although Dr. Shaker opined he disagreed with the opinions of Drs. Kurz and Li that Carter's death was a suicide and opined Carter's death was not a suicide, Dr. Shaker admitted he could not state within a reasonable degree of medical certainty that Carter's death was a homicide or the result of strangulation. Rather, Dr. Shaker speculated Carter's death was the result of an accident, such as his falling down and injuring himself in his cell or possibly an altercation with someone. However, Plaintiff presents no material facts to dispute the findings of Drs. Kurz and Li that Carter had no wounds that were inconsistent with a hanging and that there were no injuries to Carter's body that were consistent with a struggle and no defensive wounds. This leaves Dr. Shaker's speculation that Carter died and that someone staged a suicide. Plaintiff has admitted, however, he cannot establish who or what happened to Carter in his cell. Thus, Plaintiff admits he has no evidence that would establish any conduct on the part of a state actor in connection with Carter's death, much less any action or inaction on the part of any state actor in connection with Carter's death which was so egregious as to shock the conscience. However, even giving Plaintiff the extreme benefit of the doubt and assuming *arguendo* that Plaintiff could establish a constitutional violation in connection with Carter's death, Plaintiff cannot establish the alleged policies, practices, or customs of Lincoln County were the moving force behind such alleged violation.

In *Molton v. City of Cleveland*, 839 F.2d 240 (6th Cir. 1988), the administrator of the decedent's estate brought a deliberate indifference claim under § 1983 against the defendant based upon events that resulted in the suicide in the city jail. *Id.* at 241-43. As here, the only issue before the Sixth Circuit involved a § 1983 claim against the defendant City and not any named individual defendant. *Id.* at 241. The Sixth Circuit reversed the jury's verdict against the defendant City holding the Plaintiff "introduced no evidence proving the City had a custom or policy which cause the officers to be deliberately indifferent to Molton's serious medical needs." *Id.* at 243. The Sixth Circuit, citing *Monell*, noted that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," but "only when execution of a government's policy or custom . . . inflicts the injury [can] the government as an entity be responsible under § 1983." *Id.* at 244 (quoting *Monell*, 436 U.S. at 694). The Sixth Circuit stated for purposes of *Monell*:

> the word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training" unless evidence be adduced which proves that the inadequacies resulted from conscious choice - that is, proof that the policymakers deliberately chose a training program which would prove inadequate. And, in the second place, some limitation must be placed on establishing municipal liability through polices that are not themselves unconstitutional, or the test set out in Monell will become a dead letter. . . . At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.

*Id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 821-23 (1985)). The Sixth Circuit also noted the:

> plaintiff never adduced evidence of a definitive City policy, custom or usage which was an affirmative link, the moving force that animated the behavior - of the police officers that resulted in the constitutional violations alleged. The Supreme Court authorities, specifically *Tuttle* and *Pembaur*, require proof of a deliberate and

discernable city policy to maintain an inadequately trained police department, or nonsuicide-proof, inadquately designed and equipped jails; not mere speculation that such matters are "inherently matters of city policy." A second problem with plaintiff's theory is that the policies she identifies describe mere negligence.

*Id.* at 246.

### a.       The Bottom Pane of Carter's Cell

Plaintiff asserts Carter's constitutional rights were violated because Lincoln County had a policy of covering the bottom pane of glass on the door to cell 91. As noted, the Plaintiff has also asserted this alleged policy was a moving force behind the alleged constitutional violation because if the bottom pane of glass in the door to cell 91 had not been covered, someone in the booking area of the Jail might have seen "something" and "Carter might be alive today." The evidence shows the door to cell 91, the cell in which Carter died, had two panes of glass and that the bottom pane of glass was covered, at least in part, in the interest of inmate privacy. There was undisputed testimony that the top pane of glass in the cell door was uncovered and that the entire cell could be observed through the top pane of glass. There was also undisputed testimony that even if the bottom pane of glass had not been covered, all of cell 91 could not have been seen either from the booking area of the Jail or the tower area of the Jail. Finally, there was also evidence that although a CO was always present in the second floor tower area of the Jail, from which a smaller area of cell 91 could be seen than from the booking area, a CO was not always present in the booking area because the COs located in that area of the Jail were required to perform duties in other areas, including responding to problems in other areas of the Jail.

There was also undisputed testimony the bottom pane of glass on the cell door was covered due to concerns with inmate privacy and because there was a problem with some inmates exposing

themselves through the bottom pane of glass. Thus, in covering the bottom pane of glass in the doors in the booking area, the Jail officials/staff were engaged in balancing the need for security in the Jail with an inmate's/detainees right to privacy. Inmates have some reasonable expectation of a right to privacy while incarcerated, especially with regard to a claim they are forced to expose themselves to strangers, even if such privacy rights are less than those enjoyed by non-prisoners. *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). "[P]roblems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts." *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997). "[W]here . . . a state penal system is involved, federal courts have 'additional reason to accord deference to the appropriate prison authorities.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 86 (1987). "The judgment exercised by prison administrators in striking a balance between the rights of prisoners and the demands of institutional security is to be given great deference." *Baker v. Welch*, No. 03Civ.2267 (JSR)(AJP), 2003 WL 22901051, * 14 (S.D.N.Y. Dec. 10, 2003) (quoting *Timm v. Gunter*, 917 F.2d 1093, 1099-1100 (8th Cir. 1990)). Plaintiff has not established a genuine issue of material fact that Lincoln County made a conscious choice to render the Jail non-suicide proof or to render detainees in the booking area susceptible to assaults by other inmates or guards when the Jail officials balanced the needed for security at the Jail with the limited right to privacy of the inmates at the facility and covered the bottom pane of glass in the door to cell 91. The undisputed evidence shows that COs at the Jail were able to perform their cell checks and observe inmates/detainees as well as the entire cell through the top window of the cell.

In addition, even if Plaintiff had been able to establish a genuine issue of material fact as to the existence of such policy, practice, or custom, Plaintiff's speculation or conjecture that if the

bottom window had not been covered, someone in the booking area of the Jail might have seen something and Carter might be alive today, is insufficient to establish the decision to cover the bottom pane of glass in cell 91, *i.e.*, the execution of the alleged policy, practice, or custom of Lincoln County, was a moving force behind any constitutional violation or even Carter's death. A non-moving party cannot survive summary judgment unless it presents some probative evidence that would permit a jury to find in his favor based on something more than speculation or conjecture." *Lewis v. Phillip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

### b. Jail Repairs

To the extent Plaintiff alleges Lincoln County did not allocate enough funding to the Jail to make necessary repairs and/or that Jail personnel were not trained to report needed repairs, Plaintiff has not produced any evidence that Lincoln County had a policy, practice, or custom of not making necessary repairs or that Lincoln County failed to adequately train its Jail officers to report needed repairs. Plaintiff also has not produced evidence that any such policy of Lincoln County was, in any way, the moving force behind Carter's death. Both Thornton and Mullins testified the Jail made repairs. With regard to the hole in the wall in cell 91 from which the electrical outlet had been removed, Thornton testified such holes had been repaired on previous occasions, twice being concreted or plastered over and once being covered with a metal plate. Thornton testified on the occasions where the holes were concreted or plastered over, the inmates dug out or removed the concrete or plaster. Thornton also testified the holes had been covered over by a metal plate, which the inmates pulled off. Thornton testified an inmate having a flat metal plate in the Jail also created a security concern. Mullins also testified the Jail was continually making repairs and that with inmates being housed at the Jail on a 24 hour per day basis, seven days per week, the Jail would

make repairs and the inmates would undo the repairs and the Jail would have to do the repairs again. Based upon his experience as a sheriff, Mullins testified constantly repairing and re-repairing was just the nature of a Jail. Plaintiff presented no evidence to the contrary.

Plaintiff has presented no evidence Lincoln County did not make necessary repairs to the Jail or that it had a policy, procedure, or custom of inaction of not making repairs or of maintaining an unsafe Jail. Although Plaintiff refers to Burns' deposition testimony as an admission the Jail was not a safe facility at the time of Carter's death, Burns testified that due to repairs made by sheriff Blackwelder, the sheriff who succeeded Mullins, the Jail was safer than it was at the time of Carter's death [Doc. 65-8, Burns Deposition at 57-58]. However, although Burns testified the Jail was safer at the time of her deposition than it was at the time of Carter's death [*id.* at 58], Burns did not testify the Jail was unsafe at the time of Carter's death.

Thus, Plaintiff has not established a genuine issue of material fact that Lincoln County had a policy of not making repairs to the Jail, of ignoring inmate safety concerns at the Jail by not encouraging Jail personnel to report problems, or of inaction. In addition, even if Plaintiff had established a genuine issue of material fact as to the existence of such policy, procedure, or custom, Plaintiff's speculation that if the hole in the wall in cell 91 had not been there for "God knows how long" Carter might be alive is not sufficient to establish an alleged policy, procedure, or custom was the motivating factor behind any violation of Carter's constitutional rights or even his death.

### c.    The Booking Area Log

Plaintiff also asserts Lincoln County failed to train and supervise its employees on proper record keeping with respect to the booking area log book. Carr acknowledged the nearly 16-hour gap in the booking area log book, and he stated the booking area log book gets neglected, but he also

noted duplicate information is entered into the log book in the tower. Carr also testified the day shift personnel of September 16, 2005 were not doing their job properly if they did not enter data into the booking area log book. Carr admitted that at times he had neglected the log book in the booking area. Pullen testified there was always someone on duty in the tower but not always in the booking area, because the Jail employees in booking were expected to respond to problems throughout the Jail. The relevant pages from the tower log book are attached to Wurtzinger's deposition and there is no 16-hour gap in the tower log book.

Based upon the undisputed evidence, although the booking area log book for September 16, 2005 was incomplete in that it had a 16-hour gap of entries, the undisputed evidence is the booking area log book is a duplicate log book. The testimony also suggests that the log book from the tower area is likely to be more complete than the log book from the booking area because someone is always on duty in the tower area of the Jail, but that is not the case with the booking area of the Jail. As Carr admitted that any individual who failed to enter data into the booking area log book was not doing his job properly, it does not appear Lincoln County neglected to train employees to enter data into the booking area log book. At most, the evidence suggests that, on occasion, some Jail employees were negligent in failing to enter data into the booking area log book. However, "[p]roof of a single, isolated incident of misconduct by a 'nonpolicymaking' employee is not sufficient to impose liability under *Monell* unless training or supervision was "so reckless or grossly negligent" that misconduct was 'almost inevitable' or 'substantially certain to result.'" *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 200 (6th Cir.1987) (citing *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833, (1982)). Because the booking area log book and the tower log books were essentially duplicates and the evidence strongly suggests the tower log book

may have been the more complete record of events at the Jail, the fact that COs neglected to record events in the booking area log book was not so reckless or grossly negligent as to make it inevitable or substantially certain that harm, injury, or death would result to any person, including Carter.

Plaintiff suggests, based upon the testimony of former Jail administrator Austin, that the failure of the inmates to enter data in the booking area log book was grossly negligent or even reckless. Austin did describe the failure to enter data into the booking area log book as "very, very negligent." [Doc. 67-4, Austin Deposition at 38]. However, he also stated the purpose of the back up log book was to protect the Jail Administrator and/or the Sheriff from liability in the event of a lawsuit. Austin did not testify the failure to enter data into the booking area log book compromised the security of the Jail or inmates in any way. Although Plaintiff speculates that if data had been entered into the booking area of the log book he might have a better idea or better evidence of what happened to Carter, in light of the evidence presented, particularly the pages of the log book from the "tower," there is nothing more than conjecture that a more complete booking area log book would shed more light on the events at issue. There is also no evidence the incompleteness of the booking area log book for the relevant period of September 16, 2005, was in any way the motivating factor in Carter's death, because there is not a scintilla of evidence in the record suggesting that the pages of the tower log book are in any manner incomplete.

Plaintiff has not submitted evidence creating a genuine issue of material fact that Lincoln County had a policy, procedure, or custom of inadequately training or supervising its employees to record data in the log book in the booking area of the Jail. Even *assuming* arguendo Plaintiff had been able to establish such policy, procedure, or custom on the part of Lincoln County, Plaintiff's speculation that if data had been recorded in the booking area log book, he might have better

evidence or an idea as to what happened at the Jail, is insufficient to establish a genuine issue of material fact that the alleged policy was the motivating factor behind any alleged violation of Carter's constitutional rights or his death.

### d.    Failure to Staff

Plaintiff also asserts Lincoln County failed to allocate enough money to adequately staff the Jail. Although Plaintiff speculates that if there had been more staff at the Jail on September 16, 2005, Carter might be alive, Plaintiff has not submitted any evidence as to what level of staffing would have made a difference. Plaintiff characterizes Mullins' testimony as stating Lincoln County did not allocate sufficient money to adequately staff the Jail. Mullins did testify the Lincoln County Commissioners did not authorize the level of funding for the Jail he wanted and that as far as he was concerned there was never enough money for the Jail, but he also testified the number of COs at the Jail, five, was the number mandated by the state. Pullen testified there were five guards, plus the cook, who was also considered a guard, in addition to the administrators on duty during the day shift at the Jail – which made a total of seven or eight persons who could respond to situations in the Jail. In addition, Robinson, who was present when Carter was found and responded to Carter's cell, testified that even with Sanders absent, he did not feel the Jail was understaffed when Carter was discovered. Plaintiff has presented no testimony the Jail was understaffed or insufficiently staffed on September 16, 2005.

Plaintiff has not submitted evidence which creates a genuine issue of material fact that Lincoln County had a policy, practice, or custom of understaffing the Jail or inadequately funding the staffing of the Jail. Even assuming *arguendo* Plaintiff had established Lincoln County had such a policy, practice or custom, Plaintiff's speculation that if there had been more officers present

Carter might be alive today is simply conjecture and insufficient to create a genuine issue of fact as to whether any such policy might have been a motivating factor behind any alleged violation of Carter's constitutional rights or even his death on September 15, 2005.

Plaintiff has presented no evidence that a custom, policy, or inadequate and indifferent training or inaction on the part of Lincoln proximately caused any constitutional violation of Carter's rights. Plaintiff failed to present any evidence Lincoln County has a policy of failing to protect inmates or detainees at the Jail or a policy of inaction. Plaintiff failed to present any evidence indicating the necessity of a trial for resolving a material, factual dispute with respect to any custom of Lincoln County. Likewise, Plaintiff has not responded to Lincoln County's motion for summary judgment with any evidence from which a jury could find for Plaintiff on any of his claims against the County.

As noted, a plaintiff seeking to hold a governmental entity liable for the execution of a policy or custom "has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue." *Bennett v. City of Eastpointe*, 410 F.3d 810, 819 (6th Cir. 2005) (citing *King v. City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003). Because Lincoln County does not bear the burden of proof on the issue of *Monell* liability, it need only point out the lack of evidence in the record concerning the issue of liability under *Monell*. *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993), *cert. denied*, 510 U.S. 1193 (1994)) (emphasis in original). The Sixth Circuit has stated:

> Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment need not support its motion with evidence negating the opponent's claim, but the

moving party must affirmatively show the lack of evidence in the record. *Id.* at 323, 330. Once the moving party does this, the non-moving party, having the burden of persuasion on an essential element at trial, must come forward with evidence that demonstrates the existence of a genuine issue for trial. *Id.* at 324, 332. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

*Schenk v. Rubbermaid, Inc.*, No. 90-3180, 1990 WL 200313, * 1 (6th Cir. Dec. 12, 1990).

In *Griffin v. City of New York*, 287 F. Supp. 2d 392, 394-95 (S.D.N.Y. 2003), the district court granted summary judgment for defendants on the plaintiff's claims against the City of New York under *Monell*. Defendants sought summary judgment on the plaintiffs' claims "pointing out the plaintiffs would bear the burden of proof on this issue at trial, contend[ing] that they are entitled to summary judgment dismissing as to the City because the plaintiffs have no admissible evidence that the events of November 3, 2002 . . . took place according to a municipal custom or policy." *Id.* at 395. Noting that the plaintiffs had produced "no admissible evidence whatever" in support of their claims against the City, the district court granted summary judgment for the City, stating:

Plaintiffs have had ample opportunity to explore the facts pertinent to their *Monell* claim. In this situation, therefore, their failure to come forward with even a scrap of admissible evidence to support their contention that the alleged misconduct of the officers was attributable to the City under *Monell* and its progeny is dispositive.

*Id.* at 396.

The same result is reached here. Plaintiff, as the non-moving party, simply failed to present any significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute in support of his claims against Lincoln County. *Celotex Corp.*, 477 U.S. at 323. Thus,

Lincoln County is entitled to a summary judgment on Plaintiff's claims under *Monell*.

Accordingly, that aspect of Defendants' motion which seeks a summary judgment on Plaintiff's claims against Lincoln County will be **GRANTED** and those claims will be **DISMISSED WITH PREJUDICE**.

### C.       Plaintiff's State Law Claim

As noted, Plaintiff has also alleged a cause of action under the Tennessee wrongful death statute, Tenn. Code Ann. § 20-5-113 [Doc. 1].  In order to recover on a claim for wrongful death under Tenn. Code Ann. § 20-5-113, a plaintiff must prove a "defendant committed a 'wrongful act, fault, or omission' and that this wrongful act or omission caused the decedent's death." *Rains v. Bend of the River*, 124 S.W. 3d 580, 598 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 20-5-113)).  As previously noted, Plaintiff has admitted he "cannot prove who or what hurt Carter or whether it was accidental or otherwise." [Doc. 60 at 9].  Plaintiff, as the non-moving party has not presented some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute in this regard. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Because Plaintiff is unable to establish an essential element of causation, Defendants are entitled to a summary judgment on Plaintiff's wrongful death claim under Tenn. Code Ann. § 20-5-113.[5]

Accordingly, that aspect of Defendants' motion which seeks a summary judgment on

---

[5] Because Defendants' motion for summary judgment on Plaintiff's claims under 42 U.S.C. § 1983 will be granted, Plaintiff's supplemental or pendent state law claims would ordinarily be dismissed without prejudice under 28 U.S.C. § 1367(c)(2).  However, when this action was brought the Court also had diversity jurisdiction over Plaintiff's state law wrongful death claims under 28 U.S.C. § 1332.  Although Plaintiff, in his capacity as the executor of Carter's estate, was substituted for the original plaintiff, Sharpe – an action which would have resulted in a lack of diversity jurisdiction under 28 U.S.C. § 1332(c) – diversity is determined at the outset of a lawsuit and changes in parties which occur after that time generally do not destroy diversity jurisdiction. *Deutsche Financial Servs. Corp. v. Schwartz Homes*, 187 F.R.D. 542, 545 (1999).  Thus, Plaintiff's state law claims will be addressed on the merits.

Plaintiff's claims under the Tennessee wrongful death statute, Tenn. Code Ann. § 20-5-113, will be **GRANTED** and those claims will be **DISMISSED WITH PREJUDICE**.

## IV.     Conclusion

For the reasons set forth above, Defendants' motion for a summary judgment [Doc. 55] is **GRANTED** and Plaintiff's claims against Defendants under 42 U.S.C. § 1983 and under the Tennessee wrongful death statute, Tenn. Code Ann. § 20-5-113, are hereby **DISMISSED WITH PREJUDICE**.

SO ORDERED.

ENTER:


_s/Susan K. Lee_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE